James EVANS, Plaintiff–Appellant,

v.

Richard L. DUGGER, Laura A. Parada,
David E. Taubel, Bealer T. Rogers,
Hamilton D. Mathis, Thomas L. Barton,
Defendants–Appellees,

Canh T. Nguyen, Defendant.

No. 89–3453.

United States Court of Appeals,
Eleventh Circuit.

Aug. 9, 1990.

Peter M. Siegel, Randall C. Berg, Jr., Florida Justice Institute, Inc., Miami, Fla., for plaintiff-appellant.

Arthur C. Wallberg, Asst. Atty. Gen., Dept. of Legal Affairs, Tallahassee, Fla., for defendants-appellees.

Before EDMONDSON, Circuit Judge, HILL*, and HENDERSON, Senior Circuit Judges.

PER CURIAM:

James A. Evans filed this action for damages pursuant to the provisions of 42 U.S.C. § 1983 against several defendants who hold or have held various positions in the Florida Department of Corrections. Evans alleged that during his confinements at Florida State Prison ("FSP") and Union Correctional Institution ("UCI"), the defendants were deliberately indifferent to his serious medical needs as a partial paraplegic and that such indifference both caused additional injuries and exacerbated his existing condition. After a nine-day trial in the United States District Court for the Middle District of Florida, a jury answered special interrogatories in favor of the defendants. Based thereon, the court entered judgment in favor of the defendants. Evans filed this timely appeal, assigning as error (1) portions of the district court's instructions to the jury and (2) various evidentiary rulings made by the district court. We affirm.

In 1970 Evans suffered an accidental gunshot wound to his lower spinal cord. This injury resulted in partial paraplegia. Despite this handicap, Evans became involved in certain criminal ventures which led to his incarceration in 1977. After his release from prison in 1980, Evans again ran afoul of the law, and he returned to prison in 1982. Through a series of transfers made necessary for security and disciplinary reasons, Evans was transferred to FSP, a maximum security prison, on August 8, 1984.[1]

Upon Evans' arrival and in accordance with policies in force at FSP because of its status as a maximum security institution, prison authorities confiscated Evans' braces, crutches, orthopedic shoes and other personal items. To satisfy his need for mobility, the officials issued Evans a wheelchair. He was housed in an otherwise empty eight-person medical ward in FSP's clinic. FSP's medical ward was sparsely equipped for a prisoner in Evans' physical condition. Both the toilet area and the shower space lacked adequate support rails and safety bars. Narrow openings and small steps impeded his access to the shower. Neither outdoor recreation, a gymnasium nor physical therapy was accessible to him. As a result of these deprivations, Evans alleged that he lost his ability to walk with braces and crutches and that he now requires the constant use of a wheelchair.[2]

---

* See Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

1. As a pretrial detainee, Evans was introduced to and became a follower of the Hebrew–Israelite religion. Upon his conviction and incarceration, Evans became involved in a series of allegedly disruptive incidents stemming from the practice of his religion. Prison officials' efforts to manage Evans' conduct, and his unresponsiveness to those efforts, ultimately resulted in his assignment to FSP.

2. The evidence is in dispute as to the truth of this allegation.

Shortly after his assignment to FSP, Evans requested transfer to another facility. Though his request initially was rejected, prison authorities eventually transferred him to UCI in October, 1985,[3] and assigned him to the West Unit, Dorm 6. Evans' braces and crutches were returned to him, but he testified that these items were then of little value to him "because of lack of balance[;] my upper body strength wasn't as good as it was before, and my stamina was very poor. I got tired very easily." ROA Vol. 9 at p. 108. Confined to a wheelchair, Evans encountered difficulties maneuvering in his room, utilizing the bathroom facilities, going to the dining room, using both the law library and the regular library, visiting the prison chapel, gaining access to the laundry, traveling to the visitation area, transacting business in the canteen and reaching the dental clinic and hobby shop. *Id.* at 109–13. He suffered a broken leg in the shower at UCI when both the metal folding chair which he used to take a shower and his wheelchair "slid out from under [him]" as he attempted to transfer from the metal folding chair back to his wheelchair. *Id.* at 116–18, 121–22. Though the shower area had wall railings, Evans testified that the railings were insufficiently secured to support his weight. His injury required that a permanent metal plate be implanted in his leg. While hospitalized for this injury, Evans developed a blood clot in his chest which necessitated further treatment with medication. He also encountered problems with the prescribed medication and as a consequence thereof he had to return to Alachua General Hospital for approximately two weeks of additional treatment. In the latter part of 1986, Evans was transferred from UCI's Dorm 6 to Dorm 2. This dormitory had been partially renovated to accommodate handicapped inmates.[4] In January, 1987,

Evans injured his back when he fell in the law library restroom. After this occurrence, Evans sought and received a court order compelling his transfer. In February, 1987, Evans was transferred to Avon Park Correctional Institution ("Avon Park"), a "state of the art" facility designed to suit the needs of handicapped inmates.[5]

█ The eighth amendment, which prohibits "cruel and unusual punishment," provides the constitutional foundation for this cause of action. The amendment proscribes not only punishment which is physically barbarous but also punishment involving either the unnecessary and wanton infliction of pain or the imposition of pain totally without penalogical justification. *Ort v. White*, 813 F.2d 318, 321 (11th Cir. 1987), citing *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251, 258–59 (1976), and *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S.Ct. 2392, 2398, 69 L.Ed.2d 59, 68–69 (1981). These principles apply both to punishment which has been judicially imposed and to punishment resulting from the conditions of confinement. *Ort*, 813 F.2d at 321, citing *Rhodes*, 452 U.S. at 347, 101 S.Ct. at 2399, 69 L.Ed.2d at 69.

█ Conduct which does not purport to be punishment, however, violates the eighth amendment only when it involves more than ordinary lack of due care for a prisoner's interests or safety. Thus, in *Estelle*, the Supreme Court held that "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at 106, 97 S.Ct. at 292, 50 L.Ed.2d at 261. Instead, "only deliberate indifference to serious medical

---

**3.** Evans left FSP on September 16, 1985. However, prior to his arrival at UCI, Evans received treatment at the Receptional Medical Center. *See* ROA Vol. 9 at p. 87.

**4.** The renovations were made by the UCI maintenance department. In light of a variety of deficiencies, an expert testified that the renovations contained "the right elements, but they were inappropriately applied. For example, the

shower seat was in the corner adjacent to the shower. The grab bars were behind [the individual]. It's very difficult to utilize them, at that point, for a transfer or to prevent falling off of that seat." ROA Vol. 11 at p. 67.

**5.** Evans previously had been assigned to Avon Park. He was transferred to Lawtney Correctional Institution ("Lawtney") on February 21, 1984. *See supra* n. 1.

needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Id.* at 104, 97 S.Ct. at 292, 50 L.Ed.2d at 260 (citation and quotation marks omitted). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterizes the conduct prohibited by the Cruel and Unusual Punishment Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." *Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251, 260–61 (1986).[6]

Evans first claims that the district court incorrectly relied upon *Whitley* and erroneously instructed the jury that the institution and its officials could balance their interest in meeting Evans' serious medical needs with their potentially competing commitment to the safety and security of the prison staff and the inmates themselves. He states that while his allegedly disruptive conduct in institutions to which he previously had been assigned might justify his transfer to a more secure facility and might excuse that facility's inadequacies for some reasonable period of time, such conduct cannot excuse prison officials indefinitely from taking steps to satisfy his serious medical problems. Absent the need to maintain or restore order in the face of a prison disturbance, Evans

contends, the institution and its officials' responsibility to meet the health care needs of inmates continues to be judged by the "deliberate indifference" standard articulated in *Estelle*. *See* Appellant's Reply Brief at p. 3.

We agree that these particular facts do not invite the application of the *Whitley* standard. Following Evans' transfer to FSP, there existed " 'no clash between [Evans'] treatment and equally important governmental responsibilities.' " *LaFaut v. Smith*, 834 F.2d 389, 392 (4th Cir.1987) (Powell, J., sitting by designation), *quoting Whitley*, 475 U.S. at 320, 106 S.Ct. at 1084, 89 L.Ed.2d at 261. "Whether one characterizes the treatment received by [Evans] as inhumane conditions of confinement, failure to attend to his medical needs, or a combination of both, it is appropriate to apply the 'deliberate indifference' standard articulated in *Estelle* to this case." *LaFaut*, 834 F.2d at 391–92.[7]

While Evans correctly argues that, in this particular factual setting, the standard by which the prison officials' conduct must be evaluated is that of deliberate indifference to his serious medical needs, he has failed to convince us that the district court instructed the jury otherwise. He identifies the following passages of the charge as improper instructions which allowed the jury to "balance" the institution's security concern with Evans' need for medical attention.

6. *Whitley* involved the propriety of prison security measures undertaken to restore order in the face of a prison disturbance. There, the Supreme Court stated that the deliberate indifference standard failed to capture adequately the importance of prison officials' competing obligations to attend to the needs of the inmates and to ensure the safety of the prison staff, administrative personnel and the inmates themselves.

Where a prison security measure is undertaken to resolve a disturbance ... that indisputably poses significant risks to the safety of inmates and prison staff, we think the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.' *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert.*

denied sub nom. *John v. Johnson*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). *Whitley*, 475 U.S. at 320–21, 106 S.Ct. at 1085, 89 L.Ed.2d at 261.

7. *LaFaut* involved allegations of inattention to medical concerns of a prisoner with handicaps nearly identical to those suffered by Evans. We recognize that the facts of that case fail to reflect that LaFaut generated security problems similar to those which led to the eventual transfer of Evans to FSP. However, as observed above, on appeal Evans presses his claim that the defendants were inattentive to his serious medical needs *after* his transfer first to FSP and later to UCI. He does not complain of his initial transfer to FSP, an institution admittedly ill-equipped to house prisoners with Evans' handicaps. *See* ROA Vol. 9 at p. 156 (testimony of Richard L. Dugger, Superintendent of FSP from July, 1983, until January, 1987).

Defendants further contend that at every institution in which Plaintiff Evans was housed Plaintiff Evans was disruptive and created problems which jeopardized both his safety and the safety of others.

Because of the concern for the security of the institution and Mr. Evans personal safety, he was transferred to a more secure institution. These more secure institutions, although admittedly less suited for housing wheelchair bound inmates, were necessary housing assignments for Mr. Evans in light of the serious security concerns created by his disruptive behavior.

ROA Vol. 15 at pp. 64–65.

An additional principle governs the conditions of confinement of a prisoner. Correctional administrators have responsibility for both the custody of the prisoner for security purposes and the custody of the prisoner to maintain his well being. A balance must be maintained by correctional administrators so as to provide for the physical and medical needs of the individual inmate and at the same time assure that his custody and the custody of other inmates is secure.

ROA Vol. 15 at p. 74.

In the first of these instructions, the district court does not refer to the law governing the resolution of the case. Rather, the court simply sets out the contentions of the defendants, and the challenged instruction follows others wherein the court described the claims and allegations of both of the parties. *See* ROA Vol. 15 at pp. 63–65. Evans concedes that "some background material" respecting his prior behavior, the authorities' attempts to curb that behavior and the eventual transfer of Evans to FSP "was probably helpful." Appellant's Brief at p. 19. The district court simply put that background in perspective. The recitation of this history cannot be tortuously twisted into an improper instruction to the jury.

The second instruction, separated from the first by several pages in the prepared transcript, is incorporated within the district court's extensive explanation of the law governing Evans' complaint.[8] In the

---

**8.** In our review, we look at the disputed instruction not in isolation but rather in context with the remainder of the charge as an integrated whole. *Iervolino v. Delta Air Lines, Inc.,* 796 F.2d 1408, 1413 (11th Cir.1986); *see Goodson v. City of Atlanta,* 763 F.2d 1381, 1389 (11th Cir. 1985) (reversal is not required when the instructions, taken as a whole, adequately relate the law to the jury). The district court's charge included the following principles of law:

Under the Eighth Amendment Cruel and Unusual Punishment Clause a prisoner's conditions of confinement must not involve the wanton and unnecessary infliction of pain, nor may the conditions be grossly disproportionate to the severity of the crime warranting imprisonment.

Conditions that deprive inmates of the minimal civilized measure of life's necessities would be cruel and unusual according to contemporary standards of decencies.

Conditions that cannot be said to be cruel and unusual under contemporary standards are not violative of the Eighth Amendment.

. . . .

Deliberate indifference can be evidenced in many ways. For example, you may find that one or more of the Defendants were deliberately indifferent to James Evans' serious health care needs or to his needs for safe and handicapped accessible housing if one or more of them were aware of his needs and

intentionally refused to provide for those needs.

You may also find evidence of deliberate indifference as to one or more of the Defendants if you find that the health care they actually provided was so cursory as to amount to no care at all.

You may also find that one or more of the Defendants were deliberately indifferent if you find that the modifications and accommodations they made to provide handicapped inmates with safe and handicapped accessible housing were so cursory as to amount to no modifications or accommodations at all.

Deliberate indifference may also be evidenced if the Defendants ignored James Evans' serious health care needs or safe and handicapped accessible housing needs as punishment for a past wrongdoing.

You may also find that one or all of the Defendants were deliberately indifferent to James Evans' needs if one or more of them were aware of such needs and delayed meeting those needs in order to further his own interests.

The jury may find a series of incidents closely related in time that disclose a pattern of conduct amounting to deliberate indifference. Repeated examples of delayed or denied medical care for a handicapped person or continuing uncorrected conditions of confinement that deny a handicapped person safe

instruction under attack, the district court articulates an "additional principle" of which the jury should be aware. The court correctly identifies the dual responsibilities delegated to prison officials with respect to the custody and care of prisoners within their control.[9] Contrary to Evans' assertion, the district court did not instruct the jury that the prison officials might interpose security concerns as a justification for any failure to provide for the physical and medical needs of Evans. Instead, the court made clear that the prison officials operated under a mandate to provide for such needs while simultaneously assuring the safety and security of both Evans and his fellow inmates. Viewed both in isolation and in context, the challenged instruction does not constitute reversible error.

■ Evans also complains of the following jury instruction:

As part of the evidence witnesses have referred to generally accepted standards requiring handicapped accessibility.

*You are instructed that compliance with such standards was not legally required in prison housing.* Nevertheless, you may consider any evidence of accepted standards that are relevant to the construction and maintenance of the physical facilities that comprise Mr. Evans' living environment at FSP and UCI.

ROA Vol. 15 at pp. 70–71 (emphasis added).[10] Evans argues that the emphasized portion of the above instruction is erroneous and that it results from the district court's incorrect interpretation of Florida law. As support for the applicability of his requested charges 16 and 12A, the appellant relies upon certain Florida statutes requiring newly constructed or renovated public buildings intended for use by the general public to meet the needs of the physically handicapped. *See* §§ 553.46–553.49, Fla.Stat. (1985); and § 255.21, Fla. Stat. (1985). Specifically, he urges that section 553.47(2), entitled "Building classifi-

accessibility to housing facilities would indicate a deliberate indifference by supervisors.

. . . .

An additional principle governs the conditions of confinement of a prisoner. Correctional administrators have responsibility for both the custody of the prisoner for security purposes and the custody of the prisoner to maintain his well being. A balance must be maintained by correctional administrators so as to provide for the physical and medical needs of the individual inmate and at the same time assure that his custody and the custody of other inmates is secure.

Additionally, in *housing handicapped persons* prison officials should not ignore the basic needs of handicapped persons or postpone addressing those needs out of mere convenience or apathy.

It will be up to the jury to determine whether as Plaintiff's claim and the Defendants' denial and otherwise contend that while relying on claimed security purposes one or more of the Defendants did not provide the Plaintiff a living environment at FSP or UCI which met minimum, serious health and safe physical needs of the Plaintiff as a handicapped person, or alternatively refused to transfer Plaintiff Evans to an institution that could provide for the serious health and safe physical needs of a handicapped person.

ROA Vol. 15 at pp. 67–72.

9. "As we said in *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), prison administrators are charged with the re-

sponsibility of ensuring the safety of the prison staff, administrative personnel, and visitors, as well as the 'obligation to take reasonable steps to guarantee the safety of the inmates themselves.'" *Whitley,* 475 U.S. at 320, 106 S.Ct. at 1084, 89 L.Ed.2d at 261. *See also Ort,* 813 F.2d at 321–22 (application of eighth amendment in the context of prison discipline requires balancing of important concerns on both sides—protection of inmate from unnecessary and wanton infliction of pain with obligation to insure the proper administration, safety and security of penal institution).

10. Evans unsuccessfully sought the inclusion of these requested instructions:

Proposed Jury Instruction 16:
Florida law requires that every building, other than buildings which 'the general public and the physically disabled will not, except under extraordinary circumstances, be users of' be accessible to handicapped individuals. If you find that those portions of Florida State Prison or Union Correctional Institution where James Evans was confined were not accessible to him, then I instruct you that you may find that such lack of accessibility is evidence of deliberate indifference.

Proposed jury Instruction No. 12A:
I further instruct you that if a supervisory official violates a duty imposed by state law and the violation of that duty is the proximate cause of a violation of plaintiff's constitutional rights, then the supervisory official is liable for the violation of those constitutional rights.

cations," evidenced a legislative intent to include prisons within the definition of public buildings. That section states that "[f]or the purposes of this part, the following classifications are adopted: ... (2) Educational and institutional occupancy: Schools, jails, prisons, reformatories, asylums, and all other similar uses." Despite this inclusion, the district court determined that the statutes at issue and the standards promulgated thereunder did not encompass buildings and portions of buildings used solely for the purpose of housing inmates. In so concluding, the court reasoned that the language contained in section 255.21(1), which called for its applicability to "[a]ny building or facility intended for use by the general public," when read in *pari materia* with the language employed in section 553.-48(2), which provided for its applicability to "[a]ll new buildings as defined in this part ... which the general public may frequent, live in or work in," indicated an intent to restrict the meaning of the term "general public" to something less universal than "all of the people." Thus, the court held that prisoners fell outside of the term general public and that those portions of the institutions which house and confine inmates need not conform to the criteria promulgated pursuant to the disputed statutes.[11] *See* ROA Vol. 11 at pp. 31–37.

We do not decide the correctness of the district court's determination that Florida's statutory scheme mandating handicapped accessibility in public buildings is inapplicable to prisons. Considering the broad impact of such a determination and the absence of any authority from Florida's courts, we think that any ruling from the federal courts on the legislative intent of the statutes in question would be uninformed and ill-advised. Instead, assuming that the court was incorrect in reaching that conclusion and that the court's instruction to the jury based thereon was technically imperfect, we look to the charge in context and consider it "in view of the allegations made, the evidence presented and the arguments of counsel. If the charge as a whole correctly instructs the jury, no reversible error [has been] committed even though a portion of the charge may be technically imperfect." *Miller v. Universal City Studios, Inc.,* 650 F.2d 1365, 1372 (5th Cir.1981).[12] "An erroneous instruction does not require reversal unless the reviewing court is 'left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations.'" *Nat. Indep. Theatre Exhib. v. Charter Fin. Group,* 747 F.2d 1396, 1402–03 (11th Cir.1984), *quoting Miller,* 650 F.2d at 1372. With these principles in mind, we conclude that the district·court did not commit reversible error.

The role of the Florida statutes and the standards [13] adopted pursuant thereto long

---

**11.** The court did not reach the defendants' alternative argument that these laws were inapplicable in this instance because the institutions in which Evans was housed and in which he allegedly suffered injuries were constructed or renovated prior to the effective date of the statutes. The requirements established in section 255.-21(1) did not apply "to buildings or facilities existing on October 1, 1973, except as to alterations or new leases." Likewise, the handicapped accessibility rules described in §§ 553.-45 *et seq.* referred only to new buildings, which were defined as buildings "not under construction contract on October 1, 1974." § 553.48(1). In response to questions raised by this panel during oral argument, the parties submitted supplemental briefs addressing this issue. In his brief, Evans concedes that "[o]n the record, given its age and the absence of proof of remodeling, the medical ward at Florida State Prison was not required to comply with Florida's handicapped accessibility laws." Appellant's Supplemental Brief at p. 2. He continues to maintain,

however, that based upon evidence of new construction and remodeling contained in the record, "Union Correctional Institution and the West Unit were required to comply with the handicapped accessibility laws." *Id.* The record indeed reflects that Department of Corrections employees undertook some renovation of Dorm 6 of the West Unit at UCI after the threshold date established in § 255.21. *See* ROA Vol. 12 at pp. 85–86 and 153–54; Vol. 11 at 83.

**12.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), the Eleventh Circuit adopted as precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981.

**13.** By regulation, Florida adopted the standards prescribed by the United States of America Standards Institute (the "ANSI Standards"), except as those standards are modified by Part V of Chapter 553 of the Florida Statutes. *See* Chapter 130–1.006, F.A.C. (1986).

have been an issue in this litigation. In a motion *in limine*, the defendants sought to prohibit the admissibility of or the reference to the ANSI standards as determinative of the Department of Corrections' obligations to its handicapped inmates. During discussions leading to its ruling on the motion, the court observed and Evans agreed that, since the plaintiff had to establish the defendants' deliberate indifference to his serious medical needs rather than their mere negligence, the standards would be admissible not to show deliberate indifference *per se* but only as evidence of such deliberate indifference. *See* ROA Vol. 6 at pp. 14–30. The defendants' negligence, even their negligence *per se*, would not be dispositive of the issues in this case. *See Estelle, supra.* Therefore, even had the district court concluded that the Florida laws applied to those institutions housing prisoners and that the ANSI standards were admissible in their entirety, any charge to the jury based thereon could go no further than to instruct that such standards provided the bases of the defendants' obligations and that any noncompliance therewith could be considered as evidence of their deliberate indifference. The district court instructed the jury that it could "consider any evidence of accepted standards that are relevant to the construction and maintenance of the physical facilities that comprise Mr. Evans' living environment at FSP and UCI." ROA Vol. 15 at pp. 70–71.

Furthermore, the record shows that evidence of such accepted standards was before the jury. The plaintiff's expert witness, Thomas Nicholson, testified that published standards existed as guidance for ensuring that facilities were accessible to handicapped individuals.[14] ROA Vol. 10 at p. 188. During his testimony, slides [15] were shown to the jury portraying "some problems that might exist for manipulating a wheelchair and some accepted standards against which maneuver a wheelchair can be measured." ROA Vol. 11 at p. 49. Nicholson testified about his on-site investigation of both FSP and UCI, and he explained the inadequacies that he discovered and exposed the areas in which the prisons failed to comply with national standards. *See* ROA Vol. 11 at pp. 50–67, 73–100.

Additionally, the existence of the ANSI standards and the noncompliance with those standards at UCI was made known to the jury by the testimony of Emile Baudoin d'Ajoux, an employee of the Department of Corrections. He testified as to his familiarity with the uniform federal accessibility rules, the ANSI standards and those adopted by the state of Florida, and he stated that all were essentially the same. ROA Vol. 12 at 149–50. In a report prepared by d'Ajoux and read by him into the record during the trial, he observed that modifications made to Dorm 6, West Unit "to accommodate [handicapped] inmates were only minimal to permit reasonable accommodations. However, regardless of intent, modifications that were made should have met ANSI standards. Unfortunately, such was not the case.... Major repairs and modifications are still required to bring it up to standards...." ROA Vol. 12 at pp. 153–54.

Finally, neither the plaintiff's attorney nor counsel for the defendants mentioned the word "standards" in his closing argument. Though Evans' attorney repeatedly emphasized the inadequacies at both FSP and UCI, we think it particularly important in the context of this case that the defendants' counsel made no attempt to use the inapplicability of the ANSI standards, or of any other standards, as a shield from liability. In view of all of the circumstances, any omission of or misstatement by the district court in its instructions to the jury

---

**14.** In ruling on the motion *in limine,* the district court made clear that while the ANSI standards themselves were not admissible, "Mr. Nicholson may very well use ANSI as a part of his data base on which he forms his opinion...." ROA Vol. 6 at p. 58. Similarly, during a recess in the trial during Nicholson's testimony, the court reiterated that it would permit Nicholson to refer to the standards upon which he based his opinions, "including the ANSI standards." ROA Vol. 11 at p. 40.

**15.** These slides "depict essentially the ANSI standards." ROA Vol. 11 at p. 43.

does not rise to the level of a reversible error.

■ Evans' final assignment of error is directed to certain of the district court's evidentiary rulings.[16] At the trial, Evans sought the admission of numerous reports and court opinions reciting the "seventeen year history of health care failures by the Florida Department of Corrections." Appellant's Brief at p. 28. Primarily in reliance upon Fed.R.Evid. 401–403 [17] and after careful consideration of the proffered materials, the district court admitted only those portions of the documents material and relevant to the issues before the jury which were neither unduly prejudicial, confusing, misleading or cumulative. Consequently, the court permitted the introduction into evidence of redacted versions of numerous reports, plans, notices of violations at UCI, pretrial stipulations, etc. The evidence admitted clearly informed the jury of the historical deficiencies within the prison system and the defendants' notice of such deficiencies. To admit the voluminous materials offered in their entirety would have contaminated the case with irrelevant and prejudicial information. We conclude that the district court did not abuse its discretion.

The judgment of the district court is

AFFIRMED.

---

**16.** "The district court has broad discretion to admit or exclude evidence during trial and the decision to exclude certain evidence will not be reversed absent a clear showing of abuse of that discretion." *Hines v. Brandon Steel Decks, Inc.*, 886 F.2d 299, 302 (11th Cir.1989).

**17.** These rules generally allow for the admissibility of all evidence. However, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403.