927 F.2d 1312
 Paris A. MOORE, Plaintiff-Appellant,
v.
Warden WINEBRENNER, individually and in his official
capacity as Warden of the Maryland Correctional
Institution at Hagerstown, Defendant-Appellee.
and
Officer Morgan, Defendant.
 No. 88-7514.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 4, 1990.
Decided March 6, 1991.
 
 Zane David Memeger, Second-Year Law Student, Post Conviction Assistance Project, Harold Jonathan Krent (Dominique Poirier, Second-Year Law Student, Post Conviction Assistance Project, University of Virginia School of Law, Charlottesville, Va., on brief), for plaintiff-appellant.
 Timothy James Paulus, Asst. Atty. Gen., argued (J. Joseph Curran, Jr., Atty. Gen., Baltimore, Md., on brief), for defendant-appellee.
 Before POWELL, Associate Justice (Retired), United States Supreme Court, sitting by designation, and WIDENER and MURNAGHAN, Circuit Judges.
 WIDENER, Circuit Judge:
 
 
 1
 Paris A. Moore, an inmate at the Maryland Correctional Institution in Hagerstown, Maryland (MCI-H), appeals from an order of the district court granting summary judgment in Moore's action under 42 U.S.C. Sec. 1983 to defendant Wayne B. Winebrenner, the former Warden of MCI-H. We affirm.
 
 
 2
 In reviewing a grant of summary judgment, we apply the same standard as the trial court, and we view the inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party. Helm v. Western Maryland Ry. Co., 838 F.2d 729, 734 (4th Cir.1988). Thus, summary judgment is appropriate if, after evaluating the record in the light most favorable to Moore, "there is no genuine issue as to any material fact...." Fed.R.Civ.P. 56(c).
 
 
 3
 Although designed to house approximately 750 inmates, during the years 1983-85 MCI-H normally accommodated 1700-1800 prisoners. Overcrowding at MCI-H had been a problem as far back as the late 1970s, when the United States District Court for the District of Maryland entered a consent decree requiring the elimination of the double-celling that had occurred as a result of the rise in inmate population. See Washington v. Keller, 479 F.Supp. 569 (D.Md.1979). After it became apparent that compliance with the 1979 decree was unrealistic, the parties agreed to modify the consent decree in 1983. The 1983 decree allowed the continued double-celling of inmates under certain circumstances and, in addition, allowed the prison administrators to convert previously unused annexes in the basement of the prison, which had not been designed to house inmates, into housing for up to 320 prisoners. Thus, each of the eight basement annexes, four on the north side of the prison and four on the south side, provided open housing for approximately forty inmates.
 
 
 4
 Senior corrections officials agreed on a staffing plan for the annexes that provided for one officer per annex, one officer in charge of each side of the prison (four annexes), plus a roving officer for each side of the prison. Because the inmates could move freely within the particular annex in which they were housed, however, and because the annexes had not been initially constructed to house inmates, maintaining order inside the annexes was difficult. In particular, large pillars blocked the guards' view so that one guard could not supervise the entire annex at one time, and unsecured windows allowed the inmates to use "fishing lines" to pass weapons between the annexes and other parts of the prison. In addition, the entrance to each annex was secured by a locked grille. If an altercation occurred, the guard assigned to the annex was prohibited from unlocking the grille and entering the annex until backup assistance arrived. Finally, the lighting in the annexes was poor, the plumbing was in disrepair, the toilet facilities were inadequate, and the annexes contained no shower facilities.
 
 
 5
 After assuming his duties as Warden of MCI-H in the fall of 1983, Winebrenner soon became aware of the serious problems in the annexes. Because Winebrenner had no authority to hire additional guards, to close the annexes, or to transfer inmates to other institutions, he sought help from his superiors. After numerous verbal requests for assistance were unsuccessful, on March 27, 1984 Winebrenner wrote a detailed memorandum to the Commissioner of Corrections in which he related the conditions in the annexes and recommended solutions to the situation. In his memo, Winebrenner detailed the deplorable physical condition of the annexes and noted that, due to the problems with security set forth above, approximately seventy-five percent of the assaults in MCI-H occurred in or were related to the annexes.[1] Winebrenner proposed to transfer 250 inmates out of the annexes immediately and house them in the gym, where security was much better, until two additional buildings could be constructed. Winebrenner concluded: "I only know that something needs to be done immediately. I am not one to push the panic button, especially after twenty-six years in this business, however, my experience tells me we are heading for some type of disaster unless we do something."
 
 
 6
 After his memo elicited no response from his superiors, Winebrenner reported his concerns directly to the Department of Public Safety and Correctional Services. Although the two additional buildings never were authorized, Winebrenner eventually received verbal authorization to renovate the annexes and began to do so in July of 1984.
 
 
 7
 As part of the renovations, new plumbing and sewer lines were installed, showers were added, overhead pipes were repaired and secured, and the lighting was improved. In addition to improving the physical conditions in the annexes, other measures were taken to respond to the security problems. The light switches were moved outside the annexes so that only the guards could operate them, the lights were enclosed with metal to keep the inmates from knocking them out, and the windows were covered with security screens to prevent the transfer of weapons to and from other parts of the prison. Finally, Winebrenner ordered that the grille doors be left open so that the officer on duty could roam around inside the annex, and he instituted a more organized search team to conduct random searches of inmates and all areas of the prison at various times during the day.[2] Although the renovations were scheduled to take sixteen weeks to complete, the improvements actually took more than a year.
 
 
 8
 Appellant Paris Moore has been an inmate at MCI-H since June 20, 1984. On January 15, 1985 Moore was assaulted and stabbed by some of his fellow inmates while housed in the D-1 annex. On June 4, 1985 Moore filed this action pro se under 42 U.S.C. Sec. 1983 against Winebrenner and Donald K. Morgan, the guard on duty in the D-1 annex when Moore was assaulted. Fairly construed, Moore's complaint alleged that Winebrenner and Morgan violated the eighth amendment to the Constitution by failing to protect Moore from the pervasive risk of harm from other inmates at MCI-H. On October 1, 1986 the district court granted Morgan's motion for summary judgment, which Moore does not contest on appeal, but denied Winebrenner's motion for summary judgment. The parties then consented pursuant to 28 U.S.C. Sec. 636(c) to proceed before a magistrate judge and, after counsel was appointed for Moore and both sides had engaged in discovery, Winebrenner again moved for summary judgment. The magistrate judge granted summary judgment to Winebrenner, concluding that the conduct of prison officials violates the eighth amendment only if the conduct "rises to the level of wantonness, obduracy or deliberate indifference," and that "not a scintilla of evidence" supported the notion that Winebrenner acted "wantonly, obdurately or with deliberate indifference to the needs of the inmates housed in the annexes at MCI-H." Moore now appeals.
 
 
 9
 Though not conceding that a pervasive risk of harm existed in the annexes at MCI-H as a matter of historical fact, in the court below Winebrenner assumed the existence of such a risk for purposes of his motion for summary judgment. Therefore, the only questions we consider are, first, assuming the existence of a pervasive risk of harm in the MCI-H annexes, what is the appropriate legal standard against which to measure Winebrenner's conduct; and, second, given the appropriate legal standard, is there enough evidence that a jury could find that Winebrenner's conduct violated that standard? De Leon v. St. Joseph Hosp., Inc., 871 F.2d 1229, 1233 (4th Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 87, 107 L.Ed.2d 52 (1989).
 
 
 10
 With respect to the first question, this court previously stated that
 
 
 11
 where prison supervisors with knowledge of "a pervasive and unreasonable risk of harm" to the prisoners, fail to take reasonable remedial steps to prevent such harm, their conduct may be properly characterized as "deliberate indifference" or as "tacit authorization of the offensive acts," for which they may be held independently liable under Sec. 1983.
 
 
 12
 Orpiano v. Johnson, 632 F.2d 1096, 1101 (4th Cir.1980), cert. denied, 450 U.S. 929, 101 S.Ct. 1387, 67 L.Ed.2d 361 (1981). Relying upon Orpiano and previous cases from this court, Moore contends that, although the deliberate indifference standard applies, the appropriate inquiry under that standard is whether Winebrenner exercised reasonable care to protect the inmates from the pervasive risk of harm that existed at MCI-H. By contrast, Winebrenner argues, and we agree, that the "reasonable steps" language in Orpiano derives from a mere negligence standard that has been repudiated by both this court and the United States Supreme Court, and that the proper question is whether Winebrenner acted wantonly, obdurately, or with deliberate indifference to the pervasive risk of harm at MCI-H.
 
 
 13
 There is little doubt that, at one time, this court would have assessed Moore's claim under a negligence standard. For example, in Withers v. Levine, 615 F.2d 158, 162 (4th Cir.), cert. denied, 449 U.S. 849, 101 S.Ct. 136, 66 L.Ed.2d 59 (1980), the case upon which the Orpiano court relied, we stated that
 
 
 14
 the constitutional prohibition against cruel and unusual punishment requires that prison officials exercise reasonable care to provide reasonable protection from such unreasonable risk of harm. Given the pervasive and unreasonable risk of harm, negligence by prison officials in their performance of their duty of care is a violation of the constitutional right and actionable under Sec. 1983.
 
 
 15
 See also Woodhous v. Virginia, 487 F.2d 889, 890 (4th Cir.1973) (formulating reasonable care standard in reliance on Restatement (Second) of Torts ). Thus, although Orpiano purports to equate the failure to exercise reasonable care with deliberate indifference, the language and precedent upon which the case relies represents a negligence standard.
 
 
 16
 The Supreme Court, however, expressly has repudiated a negligence standard for eighth amendment claims. In Whitley v. Albers, 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986), the Court evaluated the eighth amendment claim of a prisoner who was shot during the quelling of a prison riot and stated, "To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety." The Court continued that such a reading of the eighth amendment was the foundation of its formulation in Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), of the "deliberate indifference" standard for prisoners' medical treatment claims, and concluded that "[i]t is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." Whitley, 475 U.S. at 319, 106 S.Ct. at 1084.
 
 
 17
 Thus, in Whitley the Court not only established the eighth amendment requirements as wantonness and obduracy, but also expressly rejected another of Moore's contentions, namely that its holding was limited to the context of a prison riot. This court has not been unaware of the effect of Supreme Court precedent on our prior line of cases. See Ruefly v. Landon, 825 F.2d 792, 793 (4th Cir.1987) (relying on Whitley and concluding that "[m]ere negligent conduct" is insufficient and that "[t]he relevant question is whether [the inmate] has alleged that the defendants wantonly and obdurately failed to take precautions for his safety ..."); Schrader v. White, 761 F.2d 975, 977, 979-80 (4th Cir.1985) (approving modification of Withers and Woodhous in light of Rhodes v. Chapman, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). Therefore, Moore's attempt to resurrect the negligence standard by equating it with deliberate indifference is unpersuasive, and we hold that the appropriate inquiry is whether Winebrenner acted obdurately or wantonly, Whitley at 319, 106 S.Ct. at 1084, with respect to the conditions at MCI-H.
 
 
 18
 The measurement of Winebrenner's conduct against this standard presents no difficulty. When he assumed control of MCI-H, Warden Winebrenner did not ignore or exacerbate the problems that existed in the annexes, but, as reflected by both his deposition testimony and his memo of March 27, 1984, Winebrenner embarked on a persistent campaign to rectify the situation. Although his hands were tied to some extent due to a lack of funds and a lack of authority to take immediate and drastic actions, Winebrenner eventually succeeded in effectuating major changes in the annexes. As Moore vehemently points out, deposition testimony of Moore's witness indicates that, since the renovations to the annexes were completed, the number of stabbings there "is almost nil."
 
 
 19
 In a nutshell, Moore's entire case rests on the fact that some of the changes, including placing screens over the windows, unlocking the grilles, and stationing the officer on duty inside the annexes, apparently were not instituted until shortly after the particular assault that injured him. Moore argues that, because the improvements apparently worked, and because some of them might have been instituted somewhat sooner, possibly preventing his injury, Winebrenner acted wantonly and obdurately or was deliberately indifferent to Moore's safety.
 
 
 20
 On the record before us, Moore's theory would not even satisfy a negligence standard, much less the higher standard of wantonness and obduracy required by the eighth amendment. It may be that some of the changes could have been effected a few days or even a few months earlier, but we are satisfied that the record contains no evidence of any delay of constitutional magnitude. In sum, although in hindsight one always can find some aspect of official conduct to criticize, and although it might have been more desirable not to house inmates in the annexes at all, Winebrenner did the best he could under a regrettable set of circumstances and considerable handicap.
 
 
 21
 The magistrate judge's order granting summary judgment is accordingly
 
 AFFIRMED.[3]
 MURNAGHAN, Circuit Judge, dissenting:
 
 22
 I respectfully dissent.
 
 
 23
 "Obduracy and wantonness" may be an appropriately phrased standard under 42 U.S.C. Sec. 1983 to establish culpable prison conduct in situations of prison riot or analogous violent situations. But, in the case of inaction amounting to knowing neglect, such as is here present, the appropriate standard of "deliberate indifference" does not require the higher proof implied by "obduracy and wantonness." While prison officials' attempts to alleviate conditions deserve commendation, efforts which solve only some unconscionable conditions, while failing to address others, should not guarantee prison officials relief from liability at the summary judgment stage. The standard of "obduracy and wantonness" as articulated and applied by the majority as generally in force, implies a standard for eighth amendment violations that is stricter than the "deliberate indifference" standard adopted by the Supreme Court, this circuit, and most other circuits to address the issue. Although the defendant may be unable to prove at trial that the delay in making changes to reduce the possibility of stabbings constituted "deliberate indifference," I believe that a genuine issue of material fact existed as to the defendant's conduct and that the motion for summary judgment by the defendant should have been denied.[1]
 
 
 24
 My disagreement with the majority opinion arises from the application of an "obduracy and wantonness" standard to every eighth amendment prison condition violation. I do not disagree with the use of the word "wanton"; it long has been a familiar companion in eighth amendment jurisprudence. See Gregg v. Georgia, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976) (holding that punishments would not be considered "excessive" if they did "not involve the unnecessary and wanton infliction of pain" (quoting Furman v. Georgia, 408 U.S. 238, 392-93, 92 S.Ct. 2726, 2805, 33 L.Ed.2d 346 (1972) (Burger, C.J., dissenting))). Without wavering, the Supreme Court has repeated the "general requirement that an Eighth Amendment claimant allege and prove the unnecessary and wanton infliction of pain...." Whitley v. Albers, 475 U.S. 312, 320, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986).
 
 
 25
 The meaning of "wanton" (and the phrase "unnecessary and wanton"), however, has developed in the years since Gregg. In Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1977), the Court concluded that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." Id. at 104, 97 S.Ct. at 291 (citations omitted). The Court distinguished "deliberate indifference" from "inadvertent failure[s] to provide adequate medical care," id. at 105, 97 S.Ct. at 292, and emphasized that deliberate indifference was more than mere negligence. Id. at 106, 97 S.Ct. at 292. Several years later, the Court clarified that Estelle 's "deliberate indifference" standard also would apply "when the conditions of confinement compose the punishment at issue." Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). According to the Court, "wanton," in the context of eighth amendment allegations regarding medical needs or confinement conditions, means "deliberate indifference." See Whitley v. Albers, 475 U.S. 312, 320, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986). And, "deliberate indifference," therefore, is the standard we must apply.
 
 
 26
 The majority, however, suggests that, in Whitley v. Albers, the Court adopted a new standard for eighth amendment allegations--an "obduracy and wantonness" standard. It finds the phrase in the Whitley Court's summary of eighth amendment jurisprudence, which emphasized Estelle 's holding that negligence was insufficient:
 
 
 27
 "After incarceration, only the ' "unnecessary and wanton infliction of pain" ' ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment." To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety.... It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock.
 
 
 28
 Id. 475 U.S. at 319, 106 S.Ct. at 1084 (citations omitted). None of these statements were intended, I submit, to change the preexisting legal analysis. Whitley only altered one aspect of eighth amendment jurisprudence. The invocation of the word "obdurate" symbolizes this change. When prison officials face "the necessity of balancing competing institutional concerns for the safety of prison staff or other inmates" in "decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance," id. at 320, 106 S.Ct. at 1084 (emphasis added), "unnecessary and wanton pain and suffering ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.' " Id. at 320-21, 106 S.Ct. at 1085 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.), cert. denied, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)). The new standard, which some courts have termed the "malicious and sadistic" standard, see Berry v. City of Muskogee, 900 F.2d 1489, 1494-95 (10th Cir.1990), and others, the "obduracy and wantonness" standard, see Wilson v. Seiter, 893 F.2d 861, 867 (6th Cir.1990), cert. granted, --- U.S. ----, 111 S.Ct. 41, 112 L.Ed.2d 17 (1990); see also Pressly v. Hutto, 816 F.2d 977, 979 (4th Cir.1987) (terming the prison riot standard the "more stringent 'wantonness' standard"), applies only when "a prison security measure is undertaken to resolve a disturbance." Whitley, 475 U.S. at 320, 106 S.Ct. at 1084; see Wright v. Jones, 907 F.2d 848, 851 (8th Cir.1990); Berry 900 F.2d at 1495; see also Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir.1990) (en banc ) (vacating a grant of summary judgment for prison guard because under Whitley 's malicious and sadistic standard, verbal provocation would not justify a prison guard's alleged repeated strikes with a riot baton of inmate), cert. denied, --- U.S. ----, 111 S.Ct. 1018, 112 L.Ed.2d 1100.[2]
 
 
 29
 No prison riot or actual violence confronts us here. Conditions of prison confinement, in contrast to an exigent riot or other act of violence (existing, not merely feared) must be addressed by the "deliberate indifference" standard rather than an "obduracy and wantonness" standard. See Cortes-Quinones v. Jimenez-Nettleship, 842 F.2d 556, 558 (1st Cir.) ("When prison officials ... are 'deliberately indifferent' either to prisoners' health or safety, they violate the Constitution."), cert. denied, 488 U.S. 823, 109 S.Ct. 68, 102 L.Ed.2d 45 (1988); Pressly v. Hutto, 816 F.2d 977, 979 (4th Cir.1987) ("eighth amendment protects a convicted inmate from physical harm at the hands of fellow inmates resulting from the deliberate or callous indifference of prison officials to specific known risks of such harm"). Indeed, in Whitley, the Court explicitly upheld the "deliberate indifference" standard for situations in which the allegations "can typically be established or disproved without the necessity of balancing competing institutional concerns for the safety of prison staff or other inmates." 475 U.S. at 320, 106 S.Ct. at 1084.
 
 
 30
 My discourse on the law may be summarized to the effect that "deliberate indifference" must be established to justify recovery under 42 U.S.C. Sec. 1983 by a prisoner alleging problems with confinement conditions. "Obduracy and wantonness" only applies to address violations in cases of riot or other violence. The case before us dealt with a detail of prison management before violence had erupted. Prevention here is preferable to cure.
 
 
 31
 Although "deliberate indifference," "like other famous oxymorons in law ... evades rather then expresses meaning," Duckworth v. Franzen, 780 F.2d 645, 652 (7th Cir.1985), cert. denied, 979 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986),[3] other courts' elaboration of the phrase establishes that a failure to prevent harm can raise an eighth amendment violation. In a scholarly opinion, the Berry court held that "an official or municipality acts with deliberate indifference if its conduct (or adopted policy) disregards a known or obvious risk that is very likely to result in the violation of a prisoner's constitutional rights." Id. at 1496. Deliberate indifference is shown, according to the Berry court, by (1) "actual knowledge of the specific risk ... or that the risk was so substantial or pervasive that knowledge can be inferred"; (2) a failure "to take reasonable measures to avert the harm"; and (3) a failure which in light of the knowledge "justifies liability for the attendant consequences of ... conduct, even though unintended...." Berry, 900 F.2d at 1498. Other circuits have adopted similar formulations. For example, the D.C. Circuit upheld a jury instruction which defined "deliberate indifference" as evident
 
 
 32
 if there is an obvious unreasonable risk of violent harm to a prisoner or a group of prisoners which is known to be present or should have been known, and the District through its employees ... were outrageously insensitive or flagrantly indifferent to the situation and took no significant action to correct or avoid the risk of harm to the prisoner or prisoners who were subject to the unreasonable risk of violent harm.
 
 
 33
 Morgan v. District of Columbia, 824 F.2d 1049, 1058 (D.C.Cir.1987). The Seventh Circuit has determined that an eighth amendment violation occurs where " 'the need for more or different [action] is so obvious, and the inadequacy so likely to result in the violation of constitutional rights ...,' " Santiago v. Lane, 894 F.2d 218, 223 (7th Cir.1990) (quoting City of Canton v. Harris, 489 U.S. 378, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989)), or
 
 
 34
 where defendants know of the danger or where the threat of violence is so substantial or pervasive that their knowledge could be inferred, and yet defendants fail to enforce a policy or take other reasonable steps which may have prevented the harm.
 
 
 35
 Goka v. Bobbitt, 862 F.2d 646, 651 (7th Cir.1988); see Walsh v. Mellas, 837 F.2d 789, 796 n. 3 (7th Cir.) (" 'once a pervasive risk has been established, it must be determined whether the jail officials reasonably responded to that risk' " (citations omitted)), cert. denied, 486 U.S. 1061, 108 S.Ct. 2832, 100 L.Ed.2d 933 (1988). And the Eighth Circuit has declared that liability under the eighth amendment arises when prison officials are deliberately indifferent to a prisoner's constitutional right--"if they actually intend to deprive ... or if they act with reckless disregard" of the right. "Reckless disregard ... may be shown by the existence of a pervasive risk of harm to inmates from other prisoners and a failure by prison officials to reasonably respond to that risk." Vosberg v. Solem, 845 F.2d 763, 765 (8th Cir.) (upholding jury instruction), cert. denied, 488 U.S. 928, 109 S.Ct. 313, 102 L.Ed.2d 332 (1988).[4]
 
 
 36
 No one appears to argue that the level of knowledge as to the likelihood of injury was insufficiently met in this case at the summary judgment stage. See Miltier v. Beorn, 896 F.2d 848, 851-52 (4th Cir.1990); see also Wright, 907 F.2d at 851; Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990); Goka, 862 F.2d at 651; Stubbs v. Dudley, 849 F.2d 83, 87 (2d Cir.1988), cert. denied, 489 U.S. 1034, 109 S.Ct. 1095, 103 L.Ed.2d 230 (1989). The difficult problem for the court is whether the renovations taken by the defendant demonstrate beyond any genuine issue of material fact that he was not deliberately indifferent.
 
 
 37
 The magistrate judge concluded that "not a scintilla of evidence" existed that the defendant had acted "wantonly, obdurately or with deliberate indifference to the needs of the inmates...." Although including the phrase "deliberate indifference," his addition of "wantonly" and "obdurately" was inappropriate, given that riot or other violence had not yet come into being. The magistrate judge accepted that it might be true that the defendant had done "too little too late" to protect the inmate but found persuasive the defendant's attempts "to alleviate what he recognized to be deplorable conditions." The majority has agreed with those conclusions. Judge Widener has written, "It may be that some of the changes could have been effected a few days or even a few months earlier, but we are satisfied that the record contains no evidence of any delay of constitutional magnitude."
 
 
 38
 I disagree. I submit that to excuse what has not been done, although required, because of other things that have been done, is wrong. Doing "too little too late" may potentially constitute "deliberate indifference" in circumstances such as those confronted here. At least five other circuits have explicitly held that the "deliberate indifference" standard applies to these allegations. Regardless of whether the formulation is the failure to take reasonable measures, see, e.g., Berry, 900 F.2d at 1498; Goka, 862 F.2d at 651; Vosberg, 845 F.2d 763, or the failure to take significant or obvious different action, see, e.g., Santiago, 894 F.2d at 221; Cortes-Quinones, 842 F.2d at 558; Morgan, 824 F.2d at 1058, Moore's allegations of the failure to adopt certain measures--placing screens over the windows, unlocking the grilles, and stationing the officer on duty inside the annexes--could permit a jury to conclude that the defendant had not taken significant actions to reduce the risk of stabbing.[5]
 
 
 39
 Of course, the defendant was not deliberately indifferent to some problems in the annexes--lighting was improved, walls were painted, showers were installed, plumbing was repaired. But, on summary judgment, construing the facts in the light most favorable to Moore, a genuine issue of material fact exists as to whether the defendant was deliberately indifferent as to the possibility of stabbing incidents during and in spite of the incomplete renovations. In concluding that "deliberate indifference" may exist as to the absence of specific measures taken to counter stabbing incidents despite broad remedial steps as to other conditions, I would follow in the path laid down by Judge Robert F. Chapman in Shrader v. White, 761 F.2d 975 (4th Cir.1985). Judge Chapman concluded that the prison conditions with respect to protective custody, security staffing, failure to keep inmates occupied or unexposed to illegal drugs, and locking systems did not raise an eighth amendment violation; however, he was troubled "by the statement that scrap metal is not sufficiently safeguarded and that the methods employed to restrict the making and conveyances of weapons inadequate." Shrader, 761 F.2d at 982. Judge Chapman continued, "Although the evidence does not establish that there have been many injuries from these weapons, the condition should not be allowed to exist if it can be prevented by better inventory control and supervision...." Id. The case was remanded for further proceedings on the problem. Like Judge Chapman, I find troubling Moore's contentions that after his stabbing the simple measures adopted effectively reduced the amount of violence.
 
 
 40
 The government has implied that to reverse the grant of summary judgment will be to hold that the defendant is "liable, no matter what steps he took as Warden," that he would be held to be "Mr. Moore's insurer," and that the warden would have to "engage in heroic efforts to ensure Mr. Moore's safety." Those predictions are but inflammatory rhetoric. The Constitution does not guarantee a prisoner's safety. But as judges we must guarantee that each prisoner is afforded the degree of safety provided by the Constitution. "[A]dministrative conundrum[s] cannot damp the constitutional rights of inmates of the ... jails; the Constitution extends its protections even to those incarcerated in our penal institutions and offers no allowances for fiscal or political difficulties." Morgan, 824 F.2d at 1068. A heroic effort to insure safety, although perhaps a moral duty, is not a legal one. But even ordinary unheroic humans, confronted with a known risk of danger to prisoners, must take specific measures to counter such danger or else betray the constitutional mandate against cruel and unusual punishment. Particularly because the procedures, allegedly not adopted until after Moore's stabbings, yet ultimately effective in nature, appear substantially to have depended on neither large legislative appropriations nor outside authorization, a jury should have been allowed to decide whether, given the known risk of danger in the annexes from stabbing incidents, the failure promptly to take such steps amounted to "deliberate indifference." I would reverse the grant of summary judgment for the defendant.
 
 
 
 [1]
 Because the number of inmates confined at MCI-H was approximately 1700-1800, the 320 prisoners housed in the annexes represented less than twenty percent of the total inmate population
 
 
 [2]
 Before the formal search team was instituted, correctional officers were charged with searching a certain number of cells per shift. Because the annexes were more wide open than cells, in the annexes officers checked potential hiding places such as bathrooms and the overhead piping. The officers also had authority to search the inmates' personal belongings, but were not required to do so
 
 
 [3]
 Because we conclude that the magistrate judge properly granted summary judgment to Winebrenner, we do not address Winebrenner's claim of qualified immunity
 
 
 [1]
 The magistrate judge did not address the issue of qualified immunity. Passing on it, I would find no qualified immunity at the summary judgment state. A defendant is "shielded from liability for civil damages insofar as ... [his] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). "The relevant question "is the objective (albeit fact-specific) question whether a reasonable ... [official] could have believed' the omissions here at issue to have been 'lawful in light of clearly established law and the information' they then possessed." See Cortes-Quinones v. Jimenez-Nettleship, 842 F.2d 556, 561 (1st Cir.) (quoting Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987)) (finding no qualified immunity for prison officials), cert. denied, 488 U.S. 823, 109 S.Ct. 68, 102 L.Ed.2d 45 (1988). The "deliberate indifference" standard has applied to prison officials' responsibility for prison conditions since 1981. The defendant was aware of numerous stabbings which had occurred in the annexes. I do not accept that a reasonable prison official could have believed that failing to place screens over windows, failing to relocate the guard to inside the annex, and failing to conduct periodic searches would permit him to escape eighth amendment liability merely because the same official had made painting and plumbing renovations. In the context of an even more egregious prison case, the First Circuit wrote, "[p]rison officials, working in these circumstances, understand that they are not liable for much of the harm that the system causes only because much of that harm involves matters beyond their individual control--appropriation decisions, for example, are in the hands of the legislature. Yet that fact, in the context of an unconstitutionally dangerous system, should make reasonable officials increasingly sensitive to the need to avoid those acts or omissions, within their control, that might make matters worse." Cortes-Quinones, 842 F.2d at 562 (citations omitted) (emphasis in original). Although the defendant needed legislative or outside approval for the renovations, these other measures involving screens, inter alia, were apparently within his control
 I am aware of our reminder in Lopez v. Robinson, 914 F.2d 486 (4th Cir.1990), of "the need for judicial restraint before reaching the stern conclusion that prison administrators' conduct constitutes deliberate indifference," id. at 490, and denying qualified immunity. However, in Lopez, inmates were unable to show any genuine issues of fact about certain alleged violations, for example, high or low temperatures in cells, and other claims, such as cold showers and double-celling, did not raise eighth amendment violations under established law. Qualified immunity was appropriate. Here, however, the inmate has raised a genuine issue of material fact about prison conditions which failed to protect him against the known risk of stabbing incidents. Taking the allegation to be true for summary judgment purposes, that the alleged failures to act were unlawful should have been apparent to the defendant. See also Walker v. Norris, 917 F.2d 1449, 1453 n. 7 (6th Cir.1990) (finding no qualified immunity where prison guards failed to protect inmate from attack); Santiago v. Lane, 894 F.2d 218 (7th Cir.1990) (finding no qualified immunity where prison officers allegedly did not offer inmate protective custody and had insufficient transfer policies to ensure prisoner safety); Powell v. Lennon, 914 F.2d 1459 (11th Cir.1990) (finding no qualified immunity where prison officials ignored inmates' requests to be removed from forced exposure to asbestos). Cf. Givens v. Jones, 900 F.2d 1229 (8th Cir.1990) (finding qualified immunity where physician made a medical decision to prescribe a treatment drug over patient's objection and inmate received medical attention within one month of complaining about non-acute leg pain).
 
 
 [2]
 Only the Sixth Circuit appears to have "applied Whitley 's 'obduracy and wantonness' standard to eighth amendment challenges to confinement conditions." Wilson v. Seiter, 893 F.2d 861, 867 (6th Cir.1990), cert. granted, --- U.S. ----, 111 S.Ct. 41, 112 L.Ed.2d 17 (1990). In Wilson, the court held that "the Whitley standard of obduracy and wantonness requires behavior marked by persistent malicious cruelty." Id. at 867
 
 
 [3]
 See, e.g., Evans v. Dugger, 908 F.2d 801, 805 n. 8 (11th Cir.1990) (district court's jury instruction offering numerous ways in which "deliberate indifference" can be evidenced)
 
 
 [4]
 The government has argued, in essence, that any use of the word "reasonable" in an eighth amendment violation standard is impermissible because it connotes a negligence standard of care. The government bases its argument on the Fourth Circuit's opinion in Withers v. Levine, 615 F.2d 158 (4th Cir.), cert. denied, 449 U.S. 849, 101 S.Ct. 136, 66 L.Ed.2d 59 (1980). Withers held that "[w]hen there is present in a prison ... a pervasive risk of harm ..., the constitutional prohibition against cruel and unusual punishment requires that prison officials exercise reasonable care to provide reasonable protection from such unreasonable risk of harm." Id. at 162. The court then continued, "Given the pervasive and unreasonable risk of harm, negligence by prison officials in their performance of their duty of care is a violation of the constitutional right...." Id. Withers did not establish that an ordinary duty of care, such as is usual in negligence cases, applies. It emphasized that a pervasive risk of harm must first arise. That the Withers standard was not a negligence standard was clarified by this circuit in Orpiano v. Johnson, 632 F.2d 1096, 1101 (4th Cir.1980), cert. denied, 450 U.S. 929, 101 S.Ct. 1387, 67 L.Ed.2d 361 (1981): "There is no question about the legal principle that where prison supervisors with knowledge of a 'pervasive and unreasonable risk of harm' to the prisoners, fail to take reasonable remedial steps to prevent such harm, their conduct may be properly characterized as 'deliberate indifference'...." Even in Shrader v. White, 761 F.2d 975 (4th Cir.1985), when confronted by a defendant's argument that Withers represented a "reasonable care standard," id. at 980, the court found that the principles of Withers were compatible with a reckless infliction requirement. Id. at 979. As the court stated, "we are troubled by the statement that scrap metal is not sufficiently safeguarded and that the methods employed to restrict the making and conveyance of weapons are inadequate. This would indicate a pervasive risk of harm from use of knives, and a possibly inadequate official response would appear to make out a claim if prison officials ignore the problem, after they become aware of it, and fail to take action ..." Id. at 982. Ruefly v. Landon, 825 F.2d 792 (4th Cir.1987), does not suggest an opposite conclusion. The court never had to address whether or not reasonable steps had been taken or would be required because it concluded no "specific known risk" had been shown. Id. at 794. Indeed, the most recent Fourth Circuit case applied a similar formulation and discussed actions falling far below the proper standard of care while stating that "mere negligence does not violate the eighth amendment." Miltier v. Beorn, 896 F.2d 848, 852, 853-54 (4th Cir.1990)
 
 
 [5]
 Moore's stabbing by several inmates occurred on January 15, 1985. At deposition, the defendant testified that the grilles were opened and an officer stationed inside "[s]omewhere around January of '85, I would imagine. It was--or it might have been earlier than that. I don't really recall." Donald Morgan who had been working in the annex on January 15 testified that his desk was located outside the entrance grille to the annex. William Shinham testified that "sometime in '85, we opened the grilles, put the officer in...." He also testified that screening the annex windows occurred after Moore's assault, perhaps not even until 1986. Moore has alleged that the failure to adopt these specific measures until after his attack demonstrates "deliberate indifference."