**Ronald E. TING, Plaintiff–Appellant,**

v.

**UNITED STATES of America; the Federal Bureau of Investigation; Drug Enforcement Administration; Internal Revenue Service; Joe Sheehan, et al., Defendants–Appellees.**

No. 89–55303.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 11, 1990.

Decided March 14, 1991.

Mark P. Robinson, Robinson, Robinson & Phillips, Los Angeles, Cal., for plaintiff-appellant.

Robert A. Pallemon, Asst. U.S. Atty., Los Angeles, Cal., for defendants-appellees.

Before REINHARDT and LEAVY, Circuit Judges, and THOMPSON *, District Judge.

LEAVY, Circuit Judge:

Ronald E. Ting appeals from the district court's grant of summary judgment in favor of the defendants on his *Bivens* action against five FBI agents and claims against the United States pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2674. Ting claims that the agents' use of deadly force to effect his arrest was excessive and unreasonable. We affirm in part, and reverse and remand in part.

### FACTS AND PROCEEDINGS

Commencing in 1982, the FBI and DEA conducted a joint investigation of a major

---

* Honorable Bruce R. Thompson, Senior District Judge for the District of Nevada, sitting by designation.

narcotics organization headed by Alan Mobley. A plan was eventually developed to simultaneously execute arrest warrants on twenty-seven individuals on May 12, 1984. The appellant, Ronald Ting, was one of those individuals.

In preparation for the operation, all participating officers were briefed at a meeting on May 10, 1984. Nine FBI SWAT agents were assigned to arrest Ting at his home: William Ayers, James Botting, James Burns, Wayne Cassetty, Ronald Durkin, Ronnie Frigulti, Lawrence Gallagher, Dexter Kelly, and William Melson. It was determined that SWAT assistance was needed in light of information that Ting was paranoid and unstable, that he possessed a firearm, and that he had made threats to kill several unidentified individuals in the past. Ting did not have a criminal record.

On the morning of May 12, 1984, SWAT team leader Botting went over the entry plan for Ting's residence. The team was divided into two groups: Agents Ayers, Botting, Burns, Cassetty, and Melson were to enter through the front of the house at exactly 7:00 a.m.; Agents Durkin, Frigulti, Gallagher, and Kelly were to enter simultaneously through the rear. Upon entry, the SWAT team was to locate and arrest Ting. Another team of law enforcement officials would then execute the search warrant.

At approximately 7:00 a.m., the SWAT team began to execute the arrest. The rear team was delayed in their entry, however, due to difficulties in smashing the sliding glass door which led to Ting's bedroom. Upon entry, the agents saw Ting, completely naked, kneeling behind the bed aiming a handgun at them. The agents identified themselves as FBI and instructed Ting to drop the gun.

At that point, Agent Burns entered the bedroom from the front of the house with his 12–gauge Remington shotgun drawn and aimed at Ting and ordered him to drop the gun. Burns testified that Ting dropped the gun on the bed upon his command. Burns then grabbed Ting by his left arm, pulled him to the floor, and tossed his gun to the other side of the bed. Ting was ordered to lie in a prone position face down on the floor. Fearing that a weapon was hidden under the bed, Burns eventually repositioned Ting so that he was lying or kneeling next to the bed with his head pointing towards the center of the room. Agents Ayers and Melson then entered the bedroom from the front, and Agents Frigulti and Durkin entered from the rear, and began to look for weapons or other persons hidden in the room.

According to the FBI agents who were present, Ting then suddenly pulled his arm free from Agent Burns' grasp, stood up, and lunged toward an unsecured, enclosed dressing area located behind a dividing wall on the other side of the room. It is generally agreed that Ting's lunge was not in the direction of any of the other four agents in the room, nor was it toward his gun at the foot of the bed. In response, Burns claims he fired one round at Ting's back at a distance of about four or five feet. The buckshot struck Ting high on his right shoulder. Burns claims he fired because he thought Ting was going for a weapon in the dressing area approximately twelve feet away. Burns admits that he shot to kill, not to wound.

Ting was immediately taken to the hospital emergency room where it was determined that the buckshot wounds had rendered him quadriplegic. X-rays taken at the hospital also revealed that Ting's right arm had been broken and his right shoulder dislocated at some point during the arrest. Ting suffers from traumatic retrograde amnesia and is unable to recall the events of the shooting.

Following the shooting, the SWAT team members gathered in Ting's backyard to discuss the arrest. They were later interviewed by supervisory FBI agents as part of an internal FBI administrative inquiry. A subsequent search of the residence failed to uncover any contraband. However, a knife was found hidden beneath Ting's bed mattress. An unloaded crossbow and crossbow arrows were also found in the residence. No weapons were found in the enclosed dressing area. Ting subsequently pleaded guilty to one count of conspiracy to

possess and distribute cocaine in violation of 21 U.S.C. § 846.

On October 14, 1986, Ting filed a complaint alleging *Bivens* and FTCA causes of action against thirty-four federal agents, the Internal Revenue Service, and the United States. On November 2, 1987, Ting filed a motion for leave to file an amended complaint, which the court granted on November 16, 1987. The amended complaint, filed January 5, 1988, alleged *Bivens* actions against thirty-one federal agents for excessive force under the fourth amendment, civil conspiracy, and inadequate training and supervision, and FTCA claims against the United States for inadequate training and supervision of the individual defendants, assault and battery, false arrest, and civil conspiracy.

On November 2, 1987, the defendants moved for summary judgment on all of Ting's claims. The individual defendants sought summary judgment on the *Bivens* claims on the grounds that, as a matter of law, they had not violated Ting's constitutional rights, or alternatively, that they were entitled to qualified immunity. The United States sought summary judgment on Ting's FTCA claims on the ground that, as a matter of law, there was no basis for its liability under the FTCA.

On October 3, 1988, the district court orally granted the defendants' motion for summary judgment. Judgment was entered in favor of the defendants on all of Ting's claims on February 21, 1989. This timely appeal followed.

## STANDARD OF REVIEW

A grant of summary judgment is reviewed de novo. *Taylor v. List*, 880 F.2d 1040, 1044 (9th Cir.1989). "Summary judgment is only appropriate if, viewing the evidence in the light most favorable to the party opposing the motion, the court finds that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Id.*

## DISCUSSION

### I. *BIVENS CLAIMS*

Ting argues that triable issues of material fact exist as to his *Bivens* claims[1] against the five agents (Burns, Durkin, Frigulti, Ayers, and Melson) who were present at the shooting. Specifically, Ting claims there are genuine issues of material fact concerning the circumstances of the shooting from which the trier of fact could find that the use of deadly force was unreasonable and excessive, and therefore unconstitutional.

### A. Fourth Amendment—Excessive Force

In *Graham v. Conner*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Supreme Court held that an excessive force claim arising in the context of an arrest "is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons ... against unreasonable ... seizures.'" 490 U.S. at 394, 109 S.Ct. at 1871. Accordingly, the Court held that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest ... of a free citizen should be analyzed under the Fourth Amendment and its '[objective] reasonableness' standard, rather than under a 'substantive due process' approach." *Id.*[2]

Determining the "reasonableness" of the force used to effect an arrest or seizure "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* (quotations omitted). Factors to consider include "the severity of

1. In *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the Supreme Court created a civil cause of action for injuries resulting from violations of the Constitution by federal officials.

2. In *Reed v. Hoy*, 909 F.2d 324, 328 (9th Cir. 1990) (amended), we held that the "objective reasonableness" standard enunciated in *Graham* for excessive force claims applies retroactively to civil rights actions.

the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* 109 S.Ct. at 1872.

■ The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene. *Id.* "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* Nevertheless, the reasonableness inquiry is "an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.*

Applying the fourth amendment "reasonableness" test in *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), the Court held that "[t]he use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable." *Id.* at 11, 105 S.Ct. at 1701. It found that the intrusiveness of a seizure by means of deadly force outweighed the government's interest in apprehending an unarmed fleeing felon. *Id.* at 10, 105 S.Ct. at 1701. However, the Court held that

> [w]here the officer has probable cause to believe that the suspect poses a threat of

serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Id.* at 11–12, 105 S.Ct. at 1701.[3]

### 1. Agent Burns

■ We need not decide whether the shooting of Ting would be objectively reasonable under Burns' version of the facts because material questions exist regarding the circumstances of the shooting. Ting presents evidence from which a jury could reasonably conclude that he was shot at close range while in a prone position or on his hands and knees. Mr. Steven Schlieke, a ballistics expert, is of the opinion the gun was aimed and shot horizontally or downward from skin contact up to eighteen to twenty-four inches away. This evidence directly contradicts the agents' testimony that Ting, who stands 6′ 5″ tall, was shot while upright from a distance of four to five feet.[4] If Ting's version of the shooting is believed, the trier of fact could find that Burns' use of deadly force was objectively unreasonable under the circumstances. *See White v. Pierce County*, 797 F.2d 812, 816 (9th Cir.1986) ("The question of the reasonableness of the force used in an arrest is usually for the jury.").[5]

---

3. The parties dispute the applicability of *Garner* as it involved the use of deadly force to prevent the escape of an unarmed, fleeing suspected felon. There is disagreement over whether Ting was attempting to escape or whether he was simply resisting arrest. We believe the Court's statements in *Garner* concerning the constitutionality of the use of deadly force are helpful under either scenario.

4. Agent Frigulti testified that Agent Burns shot Ting at a distance of three to five feet while he was "fully upright" or "standing." Agent Burns testified that Ting was not totally upright but that the barrel of his shotgun was even with the floor or angling upward when he fired.

5. The cause and timing of the injury to Ting's shoulder and arm may also be material to the resolution of this *Bivens* claim. In his declaration, Dr. Girar Sarian, a forensic radiologist, stated that Ting's broken arm and dislocated shoulder were caused "most probably from a twisting action of the arm at a time when the victim is placing the arm in reactive tension." If so, those injuries probably occurred prior to the shooting because "reactive tension" may be physically impossible in a quadriplegic. Ting suggests that the jury might reasonably conclude that Ting lunged, not in an attempt to reach the dressing area to obtain a weapon, but in reaction to the pain caused by these injuries.

■ The issue of whether Burns is entitled to qualified immunity also cannot be resolved as a matter of law in light of the factual conflict surrounding the circumstances of the shooting. A federal officer is immune from civil damages liability unless the unlawfulness of his conduct was apparent in light of "clearly established" law. *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). It was generally established at the time of the shooting that an officer could use deadly force to effect an arrest if, under the circumstances, he reasonably believed such force was necessary to protect himself or others from death or serious bodily harm. *See, e.g., Kortum v. Alkire*, 69 Cal.App.3d 325, 333, 138 Cal.Rptr. 26, 31 (1977). A jury could reasonably conclude that it would not be reasonable for an officer to believe the use of deadly force was lawful under Ting's version of the shooting, i.e., an unarmed and injured felon lying or kneeling on the floor surrounded by five heavily armed agents. Therefore, the district court improperly granted summary judgment in favor of Agent Burns on the excessive force claim.

### 2. Agents Ayers, Durkin, Frigulti, and Melson

■ Ting also challenges the district court's grant of summary judgment in favor of the four SWAT agents who were present at the shooting. Ting contends that these other agents are liable because they did not intervene to prevent his injuries.

■ The non-shooting agents may be held liable only if they personally deprived Ting of a constitutional right by failing to perform an act which they were legally required to do which was the cause in fact of Ting's injuries. *See Escamilla v. City of Santa Ana*, 796 F.2d 266, 268 (9th Cir. 1986). The breach of a duty arising out of tort law is insufficient to make out a claim under section 1983 as section 1983 only imposes liability for violations of rights protected by the Constitution or federal statute. *Maine v. Thiboutot*, 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980).

Ting relies only on the former as a basis for his claim. Therefore, we must determine whether the four agents had a constitutional duty to intervene to prevent Ting's injuries. *Cf. Martin v. Malhoyt*, 830 F.2d 237, 258–59 (D.C.Cir.1987) (police officer may be liable for common law negligence where he fails to protect a person in his custody from an assault perpetrated by a fellow officer).

■ We have held that while state officials are generally under no constitutional duty to protect members of the public at large from harm from third parties, "such a duty may arise by virtue of a 'special relationship' between state officials and a particular member of the public." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699–700 (9th Cir.1990) (section 1983 action). A "special relationship" exists where the state has created or assumed a custodial relationship with the plaintiff. *Id.* at 700. Under those circumstances, the state may have a constitutional duty to protect those persons in its custody "whom [it] knows to be under specific risk of harm from themselves or others in the state's custody or subject to its effective control." *Fox v. Custis*, 712 F.2d 84, 88 (4th Cir.1983). *See, e.g., Withers v. Levine*, 615 F.2d 158, 162 (4th Cir.) (duty to protect high risk inmates from known risk of homosexual assault by other inmates), *cert. denied*, 449 U.S. 849, 101 S.Ct. 136, 66 L.Ed.2d 59 (1980). *Cf. Orpiano v. Johnson*, 632 F.2d 1096, 1101–03 (4th Cir.1980) (no duty where officials did not know the work room was being used by guards to conceal assaults upon inmates), *cert. denied*, 450 U.S. 929, 101 S.Ct. 1387, 67 L.Ed.2d 361 (1981).

Applying "the general trend in appellate courts to incorporate § 1983 law into *Bivens* suits," *Ellis v. Blum*, 643 F.2d 68, 84 (2d Cir.1981), we find that summary judgment was properly granted on this claim. Burns had Ting lying or kneeling on the floor at gunpoint by the time the four officers entered the bedroom. Assuming Ting was in custody at that point, there is no evidence that the four non-shooting agents knew that Burns would hurt or shoot Ting. Ting does not allege that

Burns had a history of using abusive force in effecting arrests. Additionally, the agents were positioned around the room away from Burns and Ting and were thus physically incapable of preventing the incidents surrounding the shooting, all of which transpired in a matter of seconds. Therefore, it cannot be said that the agents' failure to intervene was the cause in fact of Ting's injuries.

### B. Fifth Amendment—Inadequate Training and Supervision

■■■■ It is well-established that a governmental officer may be held liable for damages for constitutional wrongs engendered by his failure to adequately supervise or train his subordinates. *Bergquist v. County of Cochise*, 806 F.2d 1364, 1369–70 (9th Cir.1986). Similarly, a governmental entity may also be liable for due process violations which result from its failure to train its employees. *Id.* However, the inadequacy of police training may serve as a basis for liability under section 1983 or *Bivens* "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989).

Ting's allegation that the agents' training in arrest procedures was "grossly inadequate" is not supported by the record. The undisputed evidence establishes that the agents received highly specialized and extensive training in arrest and SWAT procedures.[6] The fact the agents may not have been trained in every conceivable hostile arrest scenario, e.g., what to do if an unarmed suspect manages to free himself in the presence of two or three other armed agents, would not render their training "inadequate." *See Merritt v. County of Los Angeles*, 875 F.2d 765, 770 (9th Cir.1989). The Supreme Court held in *City of Canton* that it will not "suffice to prove that an injury or accident could have been avoided if an officer had had better or more train-

ing, sufficient to equip him to avoid the particular injury-causing conduct." 489 U.S. at 391, 109 S.Ct. at 1206.

■■■ Additionally, there is simply no evidence that the defendants made a "deliberate" or "conscious" choice not to train the agents in this respect, knowing that their failure to do so would "likely ... result in the violation of constitutional rights." *Id.* 109 S.Ct. at 1205. Accordingly, summary judgment was properly granted on this claim.

### C. Civil Conspiracy

■■■ To have an actionable *Bivens* conspiracy claim, Ting must establish (1) the existence of an express or implied agreement among the defendant officers to deprive him of his constitutional rights, and (2) an actual deprivation of those rights resulting from that agreement. A conspiracy to deprive a plaintiff of a civil rights action by lying or concealing evidence might constitute such an actionable deprivation. *Dooley v. Reiss*, 736 F.2d 1392, 1394–95 (9th Cir.), *cert. denied*, 469 U.S. 1038, 105 S.Ct. 518, 83 L.Ed.2d 407 (1984).[7]

Ting maintains that the post-shooting "meeting" in the backyard coupled with the agents' failure to explain the injury to his arm and shoulder constitutes circumstantial evidence of an agreement to "cover-up" the facts surrounding the shooting. He claims the overt acts committed in furtherance of the conspiracy include the agents' false statements regarding the circumstances of the shooting. Ting argues that there is at least a question of fact as to the truthfulness of those statements in light of the parties' conflicting versions of the shooting.

While we acknowledge that a question of fact exists regarding the circumstances of the shooting, as a matter of law Ting cannot prevail on this claim. There is insufficient evidence that the defendants "conspired" to distort the facts surrounding the

---

6. In fact, Agent Burns, a fifteen year veteran, was a firearms expert and a certified SWAT instructor.

7. In *Dooley*, the plaintiff's conspiracy claim was dismissed because she had prevailed on her section 1983 claim.

shooting so as to deprive Ting of a civil rights action. Summary judgment was therefore properly granted on this claim.

## II. FEDERAL TORT CLAIMS ACT[8]

▇▇▇ Ting alleges tort claims against the United States pursuant to the FTCA[9] for inadequate training and supervision of the agents, assault and battery, false arrest, and civil conspiracy. While *Bivens* is a judicially created cause of action against federal officers arising under the United States Constitution, FTCA actions are statutorily created; the FTCA imposes liability on the United States government for acts by its employees that constitute torts in the state where the conduct occurred. The differing standards of the FTCA and *Bivens* may lead to different results. For example, even though a federal officer's conduct conforms with the United States Constitution and therefore results in a determination that the officer is not liable under *Bivens*, that same conduct may contravene the law of the state in which the act or omission occurred and thereby subject the United States government to liability under the FTCA. Conversely, a federal officer's conduct may offend the Constitution and therefore subject him to liability in a *Bivens* action, while the law of the state in which the tort occurred may not afford any relief and therefore preclude a FTCA action against the United States. Finally, there are areas in which the state and federal law comport with each other. For instance, under both the U.S. Constitution and California law, an officer may not use deadly force "unless it is necessary to pre-

vent the escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Tennessee v. Garner*, 471 U.S. at 3, 105 S.Ct. at 1697. *See Kortum v. Alkire*, 69 Cal.App.3d at 333, 138 Cal.Rptr. at 31. In such cases, both the federal officer and the United States government may be subject to liability, under *Bivens* and the state's tort law, respectively.[10]

▇▇ As "the place where the act or omission occurred," California law governs the United States' liability in this FTCA action. 28 U.S.C. § 1346(b).

### A. Negligent Training and Supervision

▇▇▇ Ting claims the shooting was proximately caused by the government's negligence in failing to adequately train the agents on what to do if an unarmed suspect manages to free himself when in the presence of two or three other armed agents. In order to establish a claim for negligence under California law, Ting must show: (1) a legal duty to use due care; (2) a breach of that duty; and (3) that the breach was the proximate or legal cause of the injury. *United States Liab. Ins. Co. v. Haidinger–Hayes, Inc.*, 1 Cal.3d 586, 594, 83 Cal.Rptr. 418, 422, 463 P.2d 770, 774 (1970).

The government does not dispute that it was under a duty to ensure that its law enforcement officers are adequately trained and supervised. All of the officers involved in Ting's arrest were highly trained governmental agents. In the absence of other evidence, the fact that Ting

---

**8.** Ting filed administrative claims for damages with the appropriate agencies of the defendants-appellees. The DEA rejected his claim; the other agencies failed to respond within six months. Pursuant to 28 U.S.C. § 2675, Ting opted to treat the agencies' failures to respond as "final" denials of his claims. Ting therefore has effectively exhausted his administrative remedies as required by section 2675.

**9.** Section 2674 provides in pertinent part: "The United States shall be liable ... in the same manner and to the same extent as a private individual under like circumstances...."

**10.** The FTCA, however, imposes an election of remedies. While a plaintiff may maintain both

a FTCA and a *Bivens* action, he may not receive double recovery. That is, recovery against the United States bars recovery against the employee "whose act or omission gave rise to the claim." 28 U.S.C. § 2676.

Moreover, although judgment against individual federal officers in a *Bivens* action does not preclude a later action against the United States under the FTCA, judgment against the government will completely bar any subsequent action against the individual officers. *Id. See Serra v. Pichardo*, 786 F.2d 237 (6th Cir.), *cert. denied*, 479 U.S. 826, 107 S.Ct. 103, 93 L.Ed.2d 53 (1986).

was shot during the course of his arrest does not show that the government somehow breached its duty to properly train and supervise its agents. Accordingly, the district court did not err by granting summary judgment in favor of the government on this claim.

### B. Assault and Battery

■■■■■ The United States' liability under the FTCA is normally coextensive with that of a private citizen. However, because law enforcement officers have "obligations, such as the duty to execute warrants, which private citizens lack[,]" we have held that "[t]he proper source for determining the government's liability is not the law of citizen's arrests, but rather the law governing arrests pursuant to warrants." *Arnsberg v. United States*, 757 F.2d 971, 979 (9th Cir.1985), *cert. denied*, 475 U.S. 1010, 106 S.Ct. 1183, 89 L.Ed.2d 300 (1986).

■■■ Under California law, "[a]n arresting officer may use such force as is reasonably necessary to effect a lawful arrest." *David v. City of Los Angeles*, 173 Cal. App.3d 944, 957, 219 Cal.Rptr. 570, 576 (1985). A law enforcement officer is authorized to use deadly force to effect an arrest only if the felony for which the arrest is sought is "a forcible and atrocious one which threatens death or serious bodily harm, or there are other circumstances which reasonably create a fear of death or serious bodily harm to the officer or to another." *Kortum v. Alkire*, 69 Cal. App.3d at 333, 138 Cal.Rptr. at 31.

"A police officer who uses more force than is reasonably necessary to effect a lawful arrest commits a battery upon the person arrested as to such excessive force." *David*, 173 Cal.App.3d at 957, 219 Cal.Rptr. at 576. Given the factual conflict surrounding the circumstances of the shooting, it cannot be concluded as a matter of law that Burns' use of deadly force to effect Ting's arrest was "reasonable" or "necessary." Hence, summary judgment was improperly granted on this claim.

### C. False Arrest or Imprisonment

■■■■ Under California law, a cause of action for false arrest or imprisonment " 'is stated where it is alleged that there was an arrest without process, followed by imprisonment and damages.' " *Trenouth v. United States*, 764 F.2d 1305, 1307 (9th Cir.1985) (quoting *Cervantez v. J.C. Penney Co.*, 24 Cal.3d 579, 592, 156 Cal.Rptr. 198, 205, 595 P.2d 975, 982 (1979)). Where the arrest is made with process, or pursuant to a warrant, California law provides:

There shall be no liability on the part of, and no cause of action shall arise against, any peace officer who makes an arrest pursuant to a warrant of arrest regular upon its face if the peace officer in making the arrest acts without malice and in the reasonable belief that the person arrested is the one referred to in the warrant.

Cal.Civ.Code § 43.55.

Ting claims that the agents' use of excessive force constituted "malice" within the meaning of section 43.55. We disagree. "Malice," as that term is used in section 43.55, refers not to the actual physical execution of the warrant, but to the officer's state of mind in procuring or executing the warrant. For instance, malice for purposes of section 43.55 has been found in situations where the officer purposefully withheld exculpatory evidence from the magistrate issuing the arrest warrant, *Laible v. Superior Court*, 157 Cal.App.3d 44, 53, 203 Cal.Rptr. 513, 518 (1984), where the officer knowingly used false information in order to obtain the warrant, *McKay v. County of San Diego*, 111 Cal.App.3d 251, 255–56, 168 Cal.Rptr. 442, 444–45 (1980), or where the officer executes the warrant with knowledge that it has been recalled or is no longer valid. *Milliken v. City of South Pasadena*, 96 Cal.App.3d 834, 842, 158 Cal. Rptr. 409, 413 (1979). There are no such allegations in this case, and therefore the agents are immune from a claim of false arrest under section 43.55.

### D. Civil Conspiracy

■■■ There is no separate tort of civil conspiracy under California law. Rather, a

civil conspiracy under California law "requires [an] independently wrongful act and resulting damages." *Pacific Tel. & Tel. Co. v. MCI Telecommunications Corp.*, 649 F.2d 1315, 1319 (9th Cir.1981). In other words, "there is *no civil action* for conspiracy to commit a recognized tort unless the *wrongful act* itself is committed and damage results therefrom." 5 B.E. Witkin, *Summary of California Law* § 44, at 107 (9th ed. 1988) (emphasis in original).

Presumably, the tort or wrongful act is the defendants' alleged obstruction of Ting's claims under the FTCA by making false statements concerning the circumstances of the shooting. However, a civil action for damages for injuries arising from false testimony or perjury is not recognized in California. *Agnew v. Parks*, 172 Cal.App.2d 756, 765, 343 P.2d 118, 124 (1959). Accordingly, Ting's allegation of a conspiracy to obstruct the prosecution of his claims under the FTCA by false testimony does not state a cause of action under California law. *See id.*

## CONCLUSION

On the basis of the foregoing discussion the judgment of the district court is AFFIRMED IN PART, AND REVERSED IN PART AND REMANDED.

The parties shall bear their own costs on appeal.

REINHARDT, Circuit Judge, concurring in part and dissenting in part:

I concur in Parts IA, IB and II of the majority opinion. However, because I believe the majority decides Ting's *Bivens* conspiracy claim incorrectly, I respectfully dissent from Part IC of the opinion.

Ting asserts that when the non-shooting officers met after Officer Burns shot him, they agreed to make false representations regarding the facts surrounding the shooting. The record shows that the officers gathered together and discussed "the facts" of the shooting prior to being interviewed by the Federal Bureau of Investigations. They then told stories relatively consistent with Burns's version and inconsistent with Ting's. Notwithstanding these undisputed facts, the majority concludes that there is insufficient evidence from which a jury could reasonably conclude that the defendant-officers agreed to make false representations regarding the facts surrounding the shooting. I believe this conclusion to be erroneous. Ultimately, Ting may find it virtually impossible to prevail on his civil conspiracy claim. However, that possibility should not lead us to dismiss his claim with prejudice at this point.

For purposes of summary judgment, we must accept as true the non-moving party's supported allegations. *See Gillette v. Delmore*, 886 F.2d 1194, 1198 (9th Cir.1989); *Teamsters Union v. Great Western Chemical Co.*, 781 F.2d 764, 766 (9th Cir.1986). Here, Ting does not merely make a bald, unsupported allegation of a cover-up. Rather, the *evidence* demonstrates, and the majority agrees, that there is a genuine issue regarding the circumstances under which Ting was shot. If the jury accepts Ting's version of the shooting, then the non-shooting officers' version is not correct. In other words, since there is a material issue of fact whether Burns is telling the truth, there must also be the same material question with respect to the officers whose stories corroborate Burns's account of the incident.[1] Thus, if the jury found that Ting was shot in the prone position, it certainly could reasonably conclude that the officers post-incident discussion resulted in a conspiracy to cover-up evidence—i.e. an agreement to cover-up the

---

1. In his amended complaint, Ting contends that the defendant-officers gave a false account of the shooting in order to protect Agent Burns. The defendants deny this contention. As other officers were present when Agent Burns shot Ting, and those officers subsequently discussed "the facts" as a group prior to their formal interview, a jury could reasonably conclude that, if Ting was in fact shot in the prone position, the officers' testimony that he was fully upright when shot stemmed from a conspiracy to conceal or manufacture evidence. The competing versions of the facts effectively preclude the trial court from dismissing Ting's civil conspiracy claim on summary judgment.

manner in which Agent Burns shot Ting.[2] Accordingly, in my opinion, the critical question is not whether Ting presented sufficient evidence to raise a conspiracy claim, but whether a conspiracy to deprive someone of a civil rights claim by covering up the truth is actionable.

A conspiracy to obstruct a civil rights claim is actionable in the Ninth Circuit only if it succeeds in frustrating the prosecution of that claim. *See Dooley v. Reiss*, 736 F.2d 1392 (9th Cir.), *cert. denied*, 469 U.S. 1038, 105 S.Ct. 518, 83 L.Ed.2d 407 (1984); *Karim–Panahi v. Los Angeles Police Dept.*, 839 F.2d 621 (9th Cir.1988). In *Karim–Panahi*, we held that allegations that police officers' falsification of facts resulted in obstruction of justice "state a federally cognizable claim provided that defendants' actions can be causally connected to a failure to succeed in the underlying suit against the officers. *Id.* at 625 (citing *Dooley*, 736 F.2d at 1394–95 and *Landrigan v. City of Warwick*, 628 F.2d 736, 742 (1st Cir.1980)). Under our cases, Ting's *Bivens* conspiracy claim would be "mooted" if he were to succeed on the substantive counts presently before us, because the cover-up would not have resulted in a deprivation of his constitutional rights (i.e. his civil rights action). *Id.*

Our rule places Ting in a peculiar position. If he succeeds in the present action, his conspiracy claim is mooted. If he fails in the present action he theoretically has a cause of action against the officers but only if he can show that the cover-up caused that loss. Given that Ting is presently aware of the alleged cover-up, it seems unlikely that he will be able to prevail in a subsequent action if he fails to prevail in this one. Nevertheless, since the resolution of Ting's present case remains uncertain, the proper course of action is to hold that his conspiracy claim is not ripe for judicial consideration. *See Karim–Panahi*, 839 F.2d at 625. Accordingly, it is

our obligation to dismiss his *Bivens* conspiracy claim against the non-shooting officers without prejudice. *Id.* That action might not accomplish much, but it would at least have the advantage of being consistent with the current law of the circuit. For the above reasons, I dissent from Part IC of the majority opinion.

---

**2.** "To demonstrate the existence of a conspiratorial agreement, it simply must be shown that there was 'a single plan, the essential nature and general scope of which [was] known to each person who is to be held responsible for its consequences.'" *Hampton v. Hanrahan*, 600 F.2d 600, 621 (7th Cir.1979) (quoting *Hoffman–LaRoche v. Greenberg*, 447 F.2d 872, 875 (7th Cir.1971)). Circumstantial evidence may provide a sufficient basis to allow a jury to find that a conspiracy existed.